### A09A1391. ADAMS v. THE STATE.
(684 SE2d 404)

DOYLE, Judge.

After a jury trial, Andee Daniel Adams was convicted of one count of burglary[1] and one count of criminal damage to property.[2] On appeal, he argues that the trial court erred by denying his motion to suppress and challenges the sufficiency of the evidence to support both convictions. For the reasons set forth below, we affirm.

1. Adams argues that he was entitled to a full evidentiary hearing on his motion to suppress. Adams also asserts that the trial court erred by denying his motion to suppress, arguing that the facts set forth in the affidavit supporting the search warrant did not comport with the testimony of the witnesses at trial, and thus, the warrant lacked credible evidentiary support. Adams's arguments lack merit.

(a) OCGA § 17-5-30 (a) and (b) provide:

> (a) A defendant aggrieved by an unlawful search and seizure may move the court for the return of property, the possession of which is not otherwise unlawful, and to suppress as evidence anything so obtained on the grounds that: . . .
>
> (2) The search and seizure with a warrant was illegal because the warrant is insufficient on its face, there was not probable cause for the issuance of the warrant, or the warrant was illegally executed.
>
> (b) The motion shall be in writing and state facts showing that the search and seizure were unlawful. The judge shall receive evidence out of the presence of the jury on any issue of fact necessary to determine the motion; and the burden of proving that the search and seizure were lawful shall be on the state. . . .

Approximately five months before trial, Adams filed a Motion to Suppress Illegally Seized Evidence and for the Return of all

---

[1] OCGA § 16-7-1 (a).

[2] OCGA § 16-7-23 (a).

Property not Subject to Lawful Detention. In the one-page motion, he argued:

> On [October 12, 2005], officers of the Gordon County Sheriff's Office conducted an illegal search of [Adams's] person or property or both, but did not have probable cause on that date to believe Defendant was engaged in or guilty of any crime. . . . [U]nder the authority of *State v. Owens*, A07A0328, Ga. Court of Appeals (05/11/07), this motion is sufficient to put the State on notice of the specific grounds for the motion and the legal issues to be resolved at the hearing.

On the first day of trial, Adams's counsel brought to the trial court's attention that he had a number of motions, including a motion to suppress, that he wanted heard before the trial began. The trial court then heard oral argument from both parties on the motion to suppress and reviewed the warrant and supporting affidavit marked as State's Exhibit Number 1.[3] While Adams's attorney stated, "I'd like the affiant to be tested on that," when referring to the affidavit's evidence of a burglary, he made no objection to the trial court's denial of the motion to suppress without taking witness' testimony.

"When reviewing a trial court's decision on a motion to suppress, an appellate court's responsibility is to ensure that there was a substantial basis for the decision."[4] The State bears the burden of proof to show the lawfulness of the search made pursuant to a warrant.[5] "This burden is satisfied by production of the warrant and its supporting affidavit, and by showing either by those documents or by other evidence that the warrant is not subject to the statutory challenge alleged."[6] Once the State introduced the warrant and affidavit, the burden of producing evidence shifted to Adams, the challenger of the search warrant, to produce evidence to support his challenge.[7]

The trial court determined that, on its face, the affidavit contained sufficient facts for the issuance of the search warrant. At that point, it was up to Adams to produce evidence to support his

---

[3] During the trial, the warrant and affidavit were later tendered as State's Exhibit "6."

[4] (Punctuation omitted.) *Manders v. State*, 281 Ga. App. 786, 788 (2) (a) (637 SE2d 460) (2006).

[5] See *Carruth v. State*, 286 Ga. App. 431, 432 (1) (649 SE2d 557) (2007).

[6] (Punctuation omitted; emphasis supplied.) Id. at 432 (1).

[7] See *Watts v. State*, 274 Ga. 373, 375 (2) (552 SE2d 823) (2001); *Davis v. State*, 266 Ga. 212, 213 (465 SE2d 438) (1996).

challenge.[8] He failed to do so. Nor did he insist on a full evidentiary hearing.[9] "In this evidentiary posture, the [S]tate met its burden of proof as a matter of law and the denial of [Adams's] motion to suppress was mandated."[10]

(b) Adams also challenges the sufficiency of the evidence supporting the issuance of the warrant, claiming that the testimony of the witnesses at trial differed from what was represented in the detective's affidavit. "A search warrant will only issue upon facts sufficient to show probable cause[11] that a crime is being committed or has been committed."[12]

> The magistrate's task in determining if probable cause exists to issue a search warrant is simply to make a practical, common-sense decision whether, given all the circumstances set forth in the affidavit before him, including the "veracity" and "basis of knowledge" of persons supplying hearsay information, there is a fair probability that contraband or evidence of a crime will be found in a particular place.[13]

On appeal, this Court gives the magistrate's finding of probable cause substantial deference and, using the totality of the circumstances analysis, reviews the decision to determine if the magistrate had a substantial basis for concluding that probable cause existed to issue the search warrant.[14]

The facts supporting the affidavit were averred to by Detective Brian Crider. Crider swore to the following:

> On or about September 02, 2005, officers began an investigation into the theft of wiring and electronic items from the Harbison Walker building on McDaniel Station Road[,] where a vehicle belonging to And[ee] Adams was located [i]n close proximity to the crime scene. On October 12, 2005[,] the truck was again spotted near the Harbison Walker building with a four wheeler on the back of it.

---

[8] See *Watts*, 274 Ga. at 375 (2); *Davis*, 266 Ga. at 213.

[9] See *Leatherwood v. State*, 212 Ga. App. 342, 342-343 (1) (b) (441 SE2d 813) (1994).

[10] *Davis*, 266 Ga. at 213.

[11] "Probable cause means reasonable grounds, and is that apparent state of facts which seems to exist after reasonable and proper inquiry." (Punctuation omitted.) *State v. Stephens*, 252 Ga. 181, 182 (311 SE2d 823) (1984).

[12] *State v. Palmer*, 285 Ga. 75, 77 (673 SE2d 237) (2009).

[13] (Punctuation omitted.) Id. See also *Stephens*, 252 Ga. at 183; *Carruth*, 286 Ga. App. at 433 (1) ("[a] great difference exists between the level of proof required to prove guilt in a criminal case and the level required to show probable cause for arrest or search").

[14] See *Palmer*, 285 Ga. at 77-78.

Investigation revealed that the building had been burglarized earlier this date. When a vehicle belonging to the building co-owner pulled behind Adams, he fled the scene and drove to Adairsville as he was being followed by the building owners. The vehicle was found at the Adams residence at 308 Main Street Adairsville, Ga. This search warrant is to cover the residence along with outbuildings and all vehicles within the c[u]rtilage of the residence.

Based on these facts, the magistrate determined that there was probable cause to search Adams's premises for "certain property, namely: [c]ellular alarm system, wiring[,] and tools, which are the fruits of the crime of burglary."

Adams argues there was no sound basis for issuing the search warrant because the facts set forth in the affidavit were speculative at best, and because the items intended for recovery were never found at Adams's home.[15] Adams, however, does not contend that the detective was deliberately lying or was otherwise untrustworthy. "An affidavit is presumed valid in the absence of evidence that it contained deliberate falsehoods, was made with reckless disregard for the truth, or that the affiant consciously omitted material facts that, if included, would have indicated the absence of probable cause."[16] Adams has produced no such evidence and therefore has not rebutted the affidavit's validity. Under the totality of the circumstances, we cannot say that the magistrate lacked a substantial basis for concluding that probable cause existed for issuing the search warrant.[17]

2. Adams also argues that there was insufficient evidence to convict him of burglary and criminal damage to property in the second degree. We disagree.

On appeal from a criminal conviction, the evidence must be construed in the light most favorable to the verdict, and the defendant no longer enjoys the presumption of innocence; moreover, an appellate court does not weigh the evidence or determine witness credibility but only determines whether the evidence is sufficient under the standard of *Jackson v. Virginia*.[18]

---

[15] We note that while the cellular alarm system was not found at Adams's home, the search did reveal approximately 75 feet of wire in plain view in the back yard.

[16] *Smithson v. State*, 275 Ga. App. 591, 595 (2) (621 SE2d 783) (2005).

[17] See *Palmer*, 285 Ga. at 79 ("[e]ven doubtful cases should be resolved in favor of upholding a magistrate's determination that a warrant is proper") (punctuation omitted).

[18] *Manders*, 281 Ga. App. at 786. See also *Jackson v. Virginia*, 443 U. S. 307 (99 SC 2781, 61 LE2d 560) (1979).

So viewed, the evidence shows the following. The Harbison-Walker Glass Rock facility owned by Oostanaula Properties, LLC, was located in Gordon County. The facility was a fused silica manufacturing plant that had been out of operation for approximately eight to ten years prior to its purchase by Oostanaula in 2004. At the time of purchase, the facility was intact, including its copper wire, transformers, equipment, and infrastructure. In May 2005, the owners began to notice that copper wire was missing from the facility, and there were numerous burglaries and wire thefts at the facility in the years that followed.[19]

In an effort to catch the persons burglarizing the facility and stealing wire, Randall Fox, one of the owners, hired Rylie Jackson to watch the silica facility and be on the lookout for intruders. Other nearby neighbors also kept an eye on the facility. On several occasions in September and October 2005, a truck with an antique tag was observed near the facility carrying a four-wheeler in its bed. On one of these occasions, Alvin Poole observed what looked like copper wire hanging out of the back of the truck; Poole was suspicious and followed the truck to Adairsville. Adams was identified as the driver of the truck.

Adams lived in Adairsville with his wife and three children. He drove a Ford truck with an antique tag and owned several four-wheelers. Adams had a hobby of collecting old bottles and making wine and jam from blackberries he picked in the wild. On the date in question, Adams admitted to driving near the silica facility but claimed he was there to look for old bottles; he also admitted that he had been there in the past to pick blackberries.

On October 12, 2005, Fox received a call from Jackson after he heard a four-wheeler near the facility, saw one of the facility's doors open, and saw tracks that looked like a four-wheeler's in the lower building of the facility. Fox and his security coordinator, Charles Burnette, went to the facility and observed scuff marks in the silica on the floor where the wire had been dragged out of the building as well as fresh four-wheeler tracks. Fox also observed that wire, which had been intact the day before, was missing. Burnette, realizing that the perpetrator might still be in the vicinity, went back to his truck and headed to a known exit road from the plant where he saw a Ford truck carrying a four-wheeler. Burnette followed the truck, which was traveling at a high rate of speed, until he lost sight of it on the west side of Adairsville. Burnette was able to identify it as a Ford F150 truck with an antique tag.

---

[19] One of the facility owners testified that there had been as many as twenty-five incidents of theft and damage to the property.

Burnette and Fox relayed this information to the chief of police, Charles Stafford, who knew the owner of the truck. After obtaining a warrant, a search of Adams's residence revealed a Ford truck with an antique tag, several four-wheelers, and approximately seventy to seventy-five feet of conduit, which contained three equal lengths of copper wire. Attached to Adams's truck was a chain with a hook coming out of it.

At trial, Pamela Lindsey testified that she previously had been arrested for damaging property at the silica facility, and when she was at the facility, she had worked with Adams to cut pipe and wire and had shared tools with him. According to Lindsey, Adams arrived by four-wheeler and used the vehicle to drag the wire out of the facility.

(a) The State charged Adams with the offense of burglary,[20] specifically that

> on or about October 12, 2005[, Adams] unlawfully . . . without authority and with the intent to commit a theft therein, enter[ed] the business building of Oostanaula Property, LLC, located at 742 McDaniel Station Road, Gordon County, Georgia, contrary to the laws of this State.

Testimony placed Adams near the crime scene on October 12, 2005, driving his Ford truck carrying a four-wheeler, and he admits to being near the facility to search for old bottles. Fresh four-wheeler tracks were seen in and around the facility on the date in question. An owner of the facility testified that he had been to the facility the day before, and he testified that on October 12, 2005, additional wire was missing. Fox testified that the amount and type of wire found at Adams's home was the same as that used at his plant, and he was "pretty convinced" it was his wire. Fox also observed silica in the floor bed of Adams's truck and felt silica on gloves located on the truck's dashboard.

Additionally, Lindsey testified that while she was at the facility, she worked with Adams, borrowing and loaning him tools to assist in cutting and preparing the wire to be taken from the facility. Adams told her that he arrived at the facility by four-wheeler and used the four-wheeler to drag the heavy wire away from the building. This is

---

[20] OCGA § 16-7-1 (a) ("[a] person commits the offense of burglary when, without authority and with the intent to commit a felony or theft therein, he enters or remains within the dwelling house of another or any building, vehicle, railroad car, watercraft, or other such structure designed for use as the dwelling of another or enters or remains within any other building, railroad car, aircraft, or any room or any part thereof").

sufficient evidence from which a jury could have determined that Adams burglarized the silica facility on or about October 12, 2005.[21]

(b) In addition to burglary, the State charged Adams with one count of criminal damage to property in the second degree,[22] specifically that

> [o]n or about October 12, 2005[, Adams] intentionally damag[ed] the business building of Oostanaula Property, LLC, . . . without its consent, by cutting pipes and breaking junction boxes, said damage to said property being [in] excess of $500. . . .

Fox visited the facility on October 11, 2005, and therefore was able to testify as to the building's condition before and after the October 12 burglary. On October 11, Fox observed wires hanging with a shackle on them; these wires were missing the following day. Approximately 70 to 75 feet of wire and a chain hook was found at Adams's residence. Fox further testified that the value of the wire was having it in the building for purposes of resale and that it had been crudely cut from the junction box. Viewed in the light most favorable to the jury verdict, this is sufficient to establish that Adams damaged Oostanaula's property.[23]

As for the value of the damaged property, Fox testified that he obtained a $706,000 estimate of the cost to repair the facility, but admitted he had made none of the repairs. Not only is the estimate inadmissible hearsay,[24] but Fox admitted that it was an estimate of the cumulative damage done to the property by any number of people, and he could not identify what portion was attributable to the damage done by Adams. This is clearly insufficient to establish the value of the damages to be in excess of $500.

Nonetheless, there was sufficient evidence in the record to determine that the value of the property damage exceeded $500.

---

[21] See, e.g., *Smith v. State*, 253 Ga. App. 789, 790-791 (560 SE2d 348) (2002).

[22] OCGA § 16-7-23 (a) ("[a] person commits the offense of criminal damage to property in the second degree when he: (1) [i]ntentionally damages any property of another person without his consent and the damage thereto exceeds $500.00 . . .").

[23] See *In the Interest of A. F.*, 236 Ga. App. 60 (1) (510 SE2d 910) (1999) ("[i]n order to sustain a conviction for criminal damage to property in the second degree, the State was required to offer probative evidence which would sufficiently allow the factfinder to conclude [a defendant] intentionally caused in excess of $500 damage to the property of another person without that person's consent") (punctuation omitted).

[24] See *In the Interest of J. T.*, 285 Ga. App. 465, 466 (1) (646 SE2d 523) (2007); *In the Interest of A. F.*, 236 Ga. App. at 60-61 ("ordinary hearsay testimony is not only inadmissible but wholly without probative value").

There are several proper methods for proving the value of property damage.[25]

> The cost of an item, as long as it is coupled with other evidence of its condition before and after the damage, may allow the factfinder to determine the value of the damage to the property. Evidence of the cost expended to repair an item may also suffice. In the alternative, a lay witness may give her opinion as to the value so long as she states the facts on which she bases her opinion or otherwise shows she had the opportunity to form a correct opinion.[26]

In addition to obtaining the estimate, Fox testified that the cost of the wire new ranged between $8 and $12 per foot. He also testified that the scrap value of the wire was approximately $4 per pound at the time of the damage (approximately $3.50 per pound at the time of trial), and a foot of wire weighed 1.48 pounds. As for the condition of the wire, Fox testified that it was re-useable and that as of May or June 2006, it was all serviceable. Finally, Fox testified that he was an electrical contractor who worked for North Georgia Electric Membership Corporation, the utility serving power to the facility. Fox also testified that he was familiar with the copper wire used in the facility. This testimony, coupled with the fact that between 70 and 75 feet of conduit containing three copper wires of the same length (a little less than 300 pounds of wire) was found at Adams's property, was sufficient for a jury to determine that, at the very least, he had cut that much conduit from the facility, and the copper wire contained in the conduit had a value of approximately $1,050.[27]

Based on the foregoing, the evidence was sufficient to support Adams's convictions.

*Judgment affirmed. Blackburn, P. J., and Adams, J., concur.*

DECIDED OCTOBER 2, 2009.

*Timothy L. Kimble*, for appellant.

---

[25] See *In the Interest of J. T.*, 285 Ga. App. at 465 (1); *Spann v. State*, 250 Ga. App. 354, 354-355 (551 SE2d 755) (2001).

[26] (Footnotes omitted.) *In the Interest of J. T.*, 285 Ga. App. at 465 (1).

[27] Seventy feet of conduit, multiplied by three wires contained in the conduit, multiplied by 1.48, equates to 310.8 pounds of wire. Fox testified that once rolled up, the conduit containing the wires would have weighed about 100 pounds and that Adams took slightly less than 300 pounds. At even $3.50 per pound, the value of the wire would have been approximately $1,050. But see *Pate v. State*, 158 Ga. App. 395, 396-397 (2) (280 SE2d 414) (1981) (holding that testimony of the purchase price coupled with market price of scrap aluminum per pound was insufficient to establish value because no testimony was given to establish the number of pounds stolen).

*T. Joseph Campbell, District Attorney, Gregory S. Dickson, Assistant District Attorney*, for appellee.