**THIRD DIVISION**
**BARNES, P. J.,**
**BOGGS and BRANCH, JJ.**

NOTICE: Motions for reconsideration must be *physically received* in our clerk's office within ten days of the date of decision to be deemed timely filed.
http://www.gaappeals.us/rules/

June 17, 2014

# In the Court of Appeals of Georgia

A14A0420. SLAUGHTER v. THE STATE.

BRANCH, Judge.

On appeal from his conviction for aggravated stalking, burglary, and criminal damage to property, Kenneth Slaughter argues that the evidence was insufficient and that the trial court erred when it refused to charge the jury on violation of a family violence order as a lesser included offense of aggravated stalking. We find no error and affirm.

"On appeal from a criminal conviction, we view the evidence in the light most favorable to the verdict, with the defendant no longer enjoying a presumption of innocence." *Reese v. State*, 270 Ga. App. 522, 523 (607 SE2d 165) (2004) (citation omitted). We neither weigh the evidence nor judge the credibility of witnesses, but determine only whether, after viewing the evidence in the light most favorable to the

prosecution, a "rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U. S. 307, 319 (III) (B) (99 SCt 2781, 61 LE2d 560) (1979) (citation omitted).

So viewed, the record shows that after Slaughter and the victim began a romantic relationship online, Slaughter moved into the victim's home in February 2010. After a few months, however, Slaughter stopped taking his prescription medication and began behaving erratically, blaming the victim for his problems and starting numerous arguments with her. In early July 2010, the victim ended the relationship but told Slaughter that he could stay in the home until his next hospital appointment in August "if he was civil."

On July 12, 2010, the victim lent Slaughter her car while she remained at work. Driving the victim's car, Slaughter appeared in the parking lot of the victim's employer and drove in circles around other cars in the lot. When the victim went outside to give Slaughter money to take the bus home, he threw the money on the ground and "stormed off," but remained in the area so that the victim was able to drive him back to her house at the end of her workday. That evening, after an altercation with Slaughter, the victim called police, who in turn obtained an ambulance that transported Slaughter to the hospital, from which he was ejected later that night. On

the drive home with the victim, Slaughter began kicking the car's dashboard and trying to grab the steering wheel, so the victim returned Slaughter to the hospital parking lot, left him there, retrieved some belongings from her house, and went to her sister's house.

On July 14, 2010, the victim drove to her house and encountered Slaughter. She found damage on the ground floor including flooding, pulled-up carpet, dirt scattered on the underlying concrete floor, holes in the walls, and mirrors and a television smashed. One bathroom vanity had been destroyed, and a hole was knocked through an exterior wall. Although Slaughter told police that his laptop computer had been taken, none of Slaughter's property had been damaged. While Slaughter remained in the house, the victim took photographs of the damage. She then left the house and called her mother, who advised her to obtain a protective order. On July 16, 2010, the victim obtained a temporary protective order under which Slaughter was "to stay away" from the victim's residence and workplace, was "restrained and enjoined from approaching within 100 yards" of the victim herself, and was ordered "not to have any contact, direct, indirect, or through another person," with the victim. The last page of the order specified that a violation of its terms "may be punished by arrest." On the

3

same afternoon, Slaughter was personally served with the order and escorted off the victim's property.

When the victim and her mother returned to the victim's home from work on the evening of July 16, they did so in the company of police because the victim "didn't feel safe" around Slaughter without police protection. As the victim and her mother were outside in the company of a police officer, Slaughter opened the front door and came out of the house. After confirming that Slaughter had been served with the protective order, the officer arrested him for violating the terms of that order. Although Slaughter told the officer that he did not know how the house had been damaged, he showed the officer around the first floor, which now had holes punched in every wall, a space where the clothes dryer had been, water throughout, bathroom pipes broken, a gas can on the dining room table, and broken glass in the kitchen sink's garbage disposal. Damage had also been done on the second floor of the house, and the exterior air-conditioning unit had been overturned, pulling wiring out of the exterior wall. Repair costs exceeded $15,000.

Slaughter was charged with aggravated stalking, burglary, and criminal damage to property in the second degree. A jury found him guilty of all three charges, and he

was sentenced to 20 years with 10 to serve. Slaughter's motion for new trial was denied.

1. Slaughter first argues that the evidence was insufficient to sustain his convictions for (a) aggravated stalking, (b) burglary, and (c) criminal damage to property in the second degree. We disagree.

(a) OCGA § 16-5-91 (a) provides that a person commits the offense of aggravated stalking when that person, in violation of a court order including a "temporary protective order," "follows, places under surveillance, or contacts another person at or about a place or places without the consent of the other person for the purpose of harassing and intimidating the other person." OCGA § 16-5-90 (a) (1) defines "contact" as "any communication including[,] without being limited to[,] communication in person," and "harassing and intimidating" as

> a knowing and willful course of conduct directed at a specific person which causes emotional distress by placing such person in reasonable fear for such person's safety or the safety of a member of his or her immediate family, by establishing a pattern of harassing and intimidating behavior, and which serves no legitimate purpose.

A defendant "need not engage in unequivocally hostile conduct or make explicit threats in order to be convicted of stalking" or aggravated stalking. *Placanica v. State*,

5

303 Ga. App. 302, 304 (693 SE2d 571) (2010). Further, "[e]ven a single violation of a protective order may violate OCGA § 16-5-91 (a) if that violation is part of a pattern of harassing and intimidating behavior." *Brooks v. State*, 313 Ga. App. 789, 792 (1) (723 SE2d 29) (2012), citing *Louisyr v. State*, 307 Ga. App. 724, 729 (1) (706 SE2d 114) (2011). In considering whether evidence shows such a pattern, "the jury can consider a number of factors, including the prior history between the parties, the defendant's surreptitious conduct, as well as his overtly confrontational acts[ ] and any attempts by the defendant to contact, communicate with, or control the victim indirectly." *Louisyr*, 307 Ga. App. at 729 (1) (footnotes omitted).

Construed in favor of the jury's verdict, the evidence here showed that Slaughter had previously harassed the victim at work and in her car; that he destroyed property at her residence; that he returned to that residence after being served with the court order barring him from doing so; that he appeared at the door of that residence when the victim was standing less than 100 feet outside it; and that the victim was put in reasonable fear for her safety as a result of Slaughter's behavior. As such, the evidence was sufficient to sustain Slaughter's conviction for aggravated stalking. See *Louisyr*, 307 Ga. App. at 729 (1) (because OCGA § 16-5-91 does not require "multiple violations of a protective order," "a pattern of harassing behavior"

6

culminating in a single violation of a protective order was sufficient to sustain a conviction for aggravated stalking); *Jackson*, supra.

(b) OCGA § 16-7-1 (b) defines burglary as entering or remaining "within [the] . . . dwelling house of another" "without authority and with the intent to commit a felony" therein. Once a victim has "withdrawn the defendant's authority to enter [the victim's] house," the fact that a defendant may have previously lived there and had left personal property there "does not, in itself, give the defendant subsequent authority to enter." *Pittman v. State*, 230 Ga. App. 799, 802 (498 SE2d 309) (1998). Because the temporary protective order specifically deprived Slaughter of any authority to enter the victim's home, and because the evidence thus supported a conclusion that Slaughter entered that home without authority and with the intent to commit the crime of aggravated stalking, see Division 1 above, the evidence was sufficient to sustain Slaughter's conviction for burglary. See *Bray v. State*, 294 Ga. App. 562, 562-563 (1) (669 SE2d 509) (2008) (evidence that defendant entered ex-wife's residence uninvited and in violation of a bond condition and threatened her and her boyfriend was sufficient to sustain a conviction for both aggravated stalking and burglary).

7

(c) The evidence was sufficient to sustain Slaughter's conviction for second-degree criminal damage to property. OCGA § 16-7-23 (a) (1) (defining second-degree criminal damage to property as "[i]ntentionally damag[ing] any property of another person without [her] consent" in an amount exceeding $500). Although the evidence that Slaughter was the person that damaged the victim's property was circumstantial, "where the jury is authorized to find that the evidence, though circumstantial, was sufficient to exclude every reasonable hypothesis save that of guilt, that finding will not be disturbed unless the verdict of guilty is insupportable as a matter of law." *Robbins v. State*, 269 Ga. 500, 501(1), 499 SE2d 323 (1998) (citation omitted). Here, evidence showed that Slaughter was inside the victim's house on July 14, after which the victim discovered damage done there; that after being served with a protective order on the afternoon of July 16, Slaughter returned to the house, after which the victim discovered additional damage thereto; and that the cost of the total damage done by Slaughter exceeded $500. See *Adams v. State*, 300 Ga. App. 294, 300 (2) (b) (684 SE2d 404) (2009) (affirming conviction for criminal damage to property where the evidence showed that the defendant has access to the property at issue during the time it was damaged).

2. Slaughter also contends that the trial court erred when it refused his request for a charge on violation of a temporary protective order, OCGA § 16-5-95, as a lesser included offense of aggravated stalking. Again, we disagree.

"If any portion of a requested charge is inapt, incorrect, misleading, confusing, not adequately adjusted or tailored, or not reasonably raised by the evidence, denial of the charge request is proper." *Revere v. State*, 277 Ga. App. 393, 395 (2) (626 SE2d 585) (2006) (citation and punctuation omitted). "[W]e review a trial court's refusal to give a requested jury charge under an abuse-of-discretion standard." *Anderson v. State*, 319 Ga. App. 701 (738 SE2d 285) (2013) (citation and punctuation omitted).

OCGA § 16-5-95 (b) provides in relevant part that "[a] person commits the offense of violating a civil family violence order or criminal family violence order when such person *knowingly* and *in a nonviolent manner* violates the terms of such order issued against that person." (Emphasis supplied.) The record shows that although the State's evidence was sufficient to establish the elements of the crime of aggravated stalking, see Division 1 (a) above, Slaughter argued at trial that he was never served with the temporary protective order obtained by the victim and that he did not return to the house or appear at its door with the intent of harassing or intimidating her. By this record, then, the State was presenting evidence and argument

9

that Slaughter had violated a protective order with the intent to harass the victim, whereas Slaughter was presenting evidence and argument that he was never served with the protective order and did not intend to harass or intimidate the victim when he entered the house and emerged from its front door only hours after being escorted off the property. Accordingly, the jury could reasonably determine either that Slaughter was served with and violated the protective order and that he possessed the intent to harass the victim, or that he did not receive the protective order and/or did not intend to harass the victim. However, no evidence was presented that could reasonably be taken to show that Slaughter violated the protective order knowingly but nonviolently. In other words, "the evidence shows either the commission of the completed offense[ ] [of aggravated stalking] as charged, or the commission of no offense." *Brooks*, 313 Ga. App. at 794-795 (3). It follows that this trial court did not abuse its discretion when it refused to charge this jury on violation of a temporary protective order as a lesser included offense of aggravated stalking. Id.

*Judgment affirmed. Barnes, P. J., and Boggs, J., concur.*

10